

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

The United States of America,
ex rel. Terry Dixon

    Plaintiffs,

vs.

CASE NO.8:02-CV- 1737 -T-27TGW

Lincare Corp., and
Med4Home, Inc.,

    Defendants.

_____/

### CONFIDENTIAL QUI TAM COMPLAINT

Plaintiff Terry Dixon, by and through his undersigned counsel, does bring this civil action against the Defendants, pursuant to the Federal False Claims Act (FCA), 31 U.S.C. § 3730 (1999), on behalf of himself and the United States, and he further attaches a concurrent, pendent claim under Florida's Whistleblower Statute (Private Sector) and does say:

### I. JURISDICTION & VENUE

1.    Terry Dixon (Dixon) is a U.S. citizen and resident of the Middle District of Florida.

2.    Lincare Corp. (Lincare) is a Florida corporation with its principal place of business located in Clearwater, Florida.

3.    Med4Home, Inc. (Med4Home), is a corporation which was purchased by Lincare Corp. within the past year. Med4Home's principal place of business is located in Kansas City, Missouri. It is a Delaware corporation which is registered in Missouri as an out-of-state corporation authorized to do business in Missouri.



4. Both Lincare and Med4Home are involved in the process of medical prescriptions by mail order throughout the United States. Prior to the acquisition of Med4Home, these two corporations were in competition.

5. Both Lincare and Med4Home operate or do substantial business in the Middle District of Florida, or they are located and doing business within said Middle District. Med4Home is now a subsidiary of Lincare Corp. and Plaintiff refers to them collectively.

6. Plaintiff Dixon has come by his personal knowledge of fraud perpetrated by both Lincare and Med4Home as an employee computer programmer analyst who was hired to upgrade certain of the software used to process the prescription orders. During his employment he became aware of illegal and fraudulent practices, and upon informing his immediate superior at Lincare, Brad Harms, he was told to go along with the fraud and cease efforts to disclose it. Dixon refused and was terminated within the week.

7. Congress enacted the FCA in 1863 with the primary purpose of being the government's litigation tool for combating fraud against the federal government. (Senate Judiciary Committee, *False Claims Amendments Act of 1986*, S.Rep. No. 345, 99th Cong., 2d Sess. 2 (1986), reprinted in 1986 U.S.C.C.A.N. 5266)

8. The FCA authorizes private individuals, in addition to the Attorney General, to file civil actions for enforcement. (31 U.S.C.S. § 3730(b) (Supp.1994))

9. Suits by private individuals, or qui tam suits, may be brought for any substantive violation of the Act. ( Id. at § 3730(b)(1))

10. However, the suit is brought in the name of the Government which has the option of intervening and proceeding with the action. (Id. at § 3730(b)(1) & (4))

11. If the Government declines to intervene in the qui tam action, the private

individual or relator possesses the right to conduct the action. (Id. § 3730(b)(4))

12. The relator on behalf of the Government in this qui tam and retaliatory discharge case is Terry Dixon.

13. If the Government chooses to intervene, it has the primary responsibility for prosecution and may settle or dismiss the action. (Id. § 3730(c)(2))

14. The relator may continue as a party to the qui tam action and may object to its settlement or dismissal. Id. § 3730(c). However, the action may be settled or dismissed notwithstanding objection provided the relator has been notified of the proposed action and an opportunity for a hearing on the motion.

15. It is Plaintiff/Relator Terry Dixon's preference to assist, advise and give such testimony and information as is necessary to persuade the Government to intervene and actively and aggressively prosecute this case. Plaintiff Dixon's cooperation and assistance as the originator of the whistleblower complaint is founded both upon the federal False Claims Act as well as the Florida Whistleblower Statute, §§ 448.101, et. seq., Florida Statutes (2000).

16. The FCA also provides for the award of a percentage of any settlement proceeds as well as reasonable attorney's fees and costs. (Id. § 3730(d)(1)) The FCA specifically provides that in an action where the government proceeds with a case brought by a private individual, the relator "shall ... receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." (Id.) Further, a relator "shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant." (Id.) Plaintiff Dixon desires to avail himself of this remedy and

reward.

17. In addition to the substantive FCA claim, Plaintiff Dixon also has a claim of retaliatory discharge and a violation of U.S.C. § 3730(h), in that he (1) engaged in conduct protected under the False Claims Act; (2) defendant was aware of the plaintiff's actions; and (3) plaintiff was terminated in retaliation for his conduct, particularly his objection to the unlawful conduct after detecting it and refusing to participate in it. There are remedial provisions of that statute, however (such as reinstatement) that may not be in the Plaintiff's best interest. The other remedies remain unaffected, however, and the court has the power to effect an equitable front pay remedy if the circumstances permit or require.

18. Florida's Whistleblower Statute also contains a fee-shifting provision and exists to provide the same salutary purpose, but without the proportionate sharing of the recovery of moneys by the Government, but it too prohibits retaliatory discharge and follows the same legal analysis as its federal counterpart.

19. In this action, Plaintiff has actually filed a qui tam action, and thereby initiated an investigation by the Government, and also formally reported the suspected conduct to his or her employer, resulting in his discharge.

## II. OPERATIVE FACTS

20. As stated, Plaintiff Dixon was hired by Lincare in April 2002 based in large measure upon his 21 years of experience in the information technology industry of which the most recent 7 years he had spent performing computer operations with PowerBuilder application development projects as a PowerBuilder Consultant.

21. Plaintiff was hired by Brad Harms in a "permanent" position to replace more expensive and less qualified independent contractors and he had successfully completed his

90-day probation period.

22. Dixon was hired to patch up software design problems that had resulted in a backlog of computer design enhancement needs. This backlog specifically had to do with the "Pharmware" software recently acquired by Lincare as part of its acquisition of Med4Home, Inc. Prior to Plaintiff's being hired, Lincare was relying upon temporary outside contract programmers to resolve the technical problems, but the job wasn't being completed timely, efficiently or economically. Plaintiff Dixon was hired to clean up the problems and then turn his efforts to rewriting and enhancing the software.

23. Mr. Dixon performed as expected and his efforts were lauded. However, in the process of examining the various computer operations and programs, he became aware of some irregularities in the Pharmware reporting system and production database which he brought to the attention of his supervisor, Brad Harms. Mr. Harms appeared none too interested in Mr. Dixon's discovery, but within little more than a week, Mr. Dixon was summarily let go because of a purported reorganization and position elimination. Mr. Dixon thought that most anomalous since the need for his services was still there, Lincare's business was growing, the software still needed to be redone, and the temporary contractor who was on site and not getting the job done when Mr. Dixon was hired was retained, and even had his contract extended.

24. Plaintiff Dixon plainly and clearly communicated to Brad Harms that there were serious irregularities and improprieties in the way prescription orders were being recorded, sold and shipped, and Plaintiff proposed remedies. Brad Harms, however, instructed Plaintiff to discontinue his efforts at "fixing" the problems, and ordered him to continue the irregularities and improprieties, and when Plaintiff refused he was terminated on or about August 30, 2002. The reason given was a pretext.

25.  Plaintiff was sent to the business office of Med4Home shortly after being hired by Lincare for several days to address computer software problems there with their Pharmware computer program that is used for processing prescription transactions. During his software review and examination of these programs he learned that Med4Home ships prescription medications by U.S. Mail as follows:

    a.    The customer sees an advertisement by Med4Home (e.g., TV ads, brochure, mailers, etc.).

    b.    The customer calls the Med4Home sales department and inquires.

    c.    The Med4Home sales rep first establishes that the prospective customer is eligible for Medicare coverage, and, if so, the sales rep collects the customer information including the name of the customer's Physician.

    d.    The sales rep enters the prospective customer's information in to the Pharmware production database.

    e.    The sales rep calls the prospective customer's Physician, who says either "Yes" or "No" to the mail order prescription.

    f.    When the Physician says "Yes" the sales rep checks the "Physician Said Yes" box, and the Physician's Rx will be sent via fax hard copy within a few days.

    g.    Approximately 50% of the time, Plaintiff learned, the Physician says "No" and the sell rep checks the "No" box accordingly.

    h.    The Pharmware application's design will not allow any medications to be shipped to prospective customers whose physician said "No" (an error message will display on the computer screen if this is attempted), and up

     to this point in the prescription processing everything appears to be legitimate.

  i. Where things turned illegitimate is that towards the end of each month the contract programmer(s) would perform an Structured Query Language (SQL) update to the Pharmware production database changing the "Physician Said No" to "Physician Said Yes." Once this "SQL Update" was performed the Pharmware application would then allow the medications to be shipped, but there are no faxed Rx hard copies for these medications, since the Physician refused to approve the Rx and such copies do not exist. The Defendants fake the approval where none has been authorized by changing information in the computer.

  j. Thus, at some level above the sales reps, officials of Med4Home contravened the instructions of a customer's physician without the knowledge of the physician or the patient, and fraudulently effected a sale that was illegal and without authority. This is what Plaintiff learned and communicated to Brad Harm, but that was not the full extent of the impropriety that Plaintiff discovered.

26. Plaintiff also learned shortly after becoming an employee of Lincare that Lincare was also engaging in other questionable or inappropriate practices. For instance, he learned that Lincare, with full knowledge and intent, was making multiple shipments to customers who received several prescriptions by mail, when these multiple prescriptions could have and should have been shipped in a single shipping container that had abundant room for all the prescriptions a single customer would be sent. Plaintiff learned when he inquired at this apparent inefficiency

and mismanagement that the managers of Lincare intended this result because the company made much more money off the unnecessary and repetitive shipments.

27. Employees at one or the other of the Defendant companies with full knowledge of these practices, based upon discussions between them and Dixon or necessarily involved in the process, include:

**Brad Harms**, PC Systems Manager (Lincare)

**Greg Keesey**, Contract Programmer

**Manoj Vijayan**, Contract Programmer

**Kurt Morrison**, Programmer Analyst (Med4Home)

**Brent Eberts**, Sells Manager (Med4Home)

**Marty Williams**, Sr. Pharmacist

28. Plaintiff's discovery was based mainly on the medication sales activity for the month of July 2002, but he had access to other data and cumulative information that showed that that period was typical and that the fraud was an ongoing matter. He believes that a direct and simple reconciliation of the Medicare medication billings against the prescriptions that Med4Home can produce for a given period of time will confirm the fraud. He has already brought the questionable sales activity for the month of July 2002 to the attention of both Brad Harms, and Greg Keesey (contract programmer), and believes that the July sales activity may have been further manipulated in order to conceal the fraud. Still, he believes that a check of even a sample of the filled orders against the confirmed physician approvals will reveal the fraud because he was told that some 50% of the prescriptions which were shipped were without physician authorization.

29. The majority of the fraud described above took place prior to the time that Lincare

purchased Med4Home. Plaintiff learned that Med4Home caught the attention of Lincare by showing continued increases in sales figures, to the point that Lincare saw them as such a threat that buying them out became necessary. Plaintiff's understanding is that Lincare purchased Med4Home during the past year. But after Med4Home became a subsidiary of Lincare, the illegal practices were still going on and when Plaintiff made it known to his superiors he was fired.

30. Plaintiff believes that the only way that Lincare can cover up its fraudulent activity is to (a) Find some doctors who are willing to retroactively falsify thousands of Prescriptions or (b) change the medications sales to look like equipment sales. Plaintiff suggests that Medicare, the U.S. Attorney, or the Attorney General (or all of them) speedily conduct an investigation before the fraud can be concealed. Even though it is large in scope, technology is rapidly evolving and Plaintiff knows only too well how records can be destroyed, altered, concealed or otherwise distorted and manipulated.

31. Plaintiff has engaged the services of the undersigned attorney, an active member in good standing of both the Florida Bar and the federal bar of the Middle District and the Eleventh Circuit. Plaintiff and the undersigned have entered into a fee agreement whereby counsel will, if Plaintiff prevails, be entitled to a reasonable fee.

32. Plaintiff has lost wages, benefits and other valuable property as a result of his discharge from Lincare in retaliation for having engaged in lawfully protected conduct protesting fraud of his employer.

### Count I (Qui Tam Action)

33. Plaintiff adopts the factual allegations stated above. This is a qui tam action on behalf of the United States, alleging that both Defendants Lincare Corp. and Med4Home, Inc.

have engaged in an ongoing pattern of criminal conduct, fraud, misrepresentation and other improper conduct contrary to the laws of the United States, the state of Florida, and various other codes, rules and regulations regulating the furnishing of medications for profit.

34.  Plaintiff is an originator of this complaint and to his knowledge he is the first person to bring such information to the attention of the Government.

35.  Plaintiff requests intervention by the United States, and understands that this Complaint will be secret and confidential until such time as the Government has an opportunity to explore Plaintiff's allegations and determine if a fraud is being perpetrated against the United States or its citizens. Plaintiff is no longer an insider, but he has information of significant importance as to where government investigators can search to obtain proof of the fraud.

36.  Plaintiff has been terminated for objecting to the unlawful ongoing conduct and he has lost income, opportunities, and benefits, in addition to having engaged the services of legal counsel and incurring costs and fees in that regard. He has also spent significant time and effort consulting with his attorney, sharing information, and attempting to locate other proof of his claim in order to assist the Government in making a meaningful inquiry of the Defendants' actions.

37.  Plaintiff requests those remedies under the FCA to which he is entitled, to include a percentage of the recovery or settlement made by or with the Defendants, as well as reimbursement of his attorney's fees and costs, and a reasonable attorney's fee for his attorney.

### Count II (Retaliatory Discharge Under § 3730(h))

38.  Plaintiff readopts the factual allegations above and asserts that these allegations constitute the separate violation of the FCA known as retaliatory discharge, in violation of 31 U.S.C. § 3730(h), which states that

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

39. Plaintiff applies for and requests all relief to which he is entitled by this subsection of the FCA, though he frankly thinks that reinstatement might not be a healthy proposal, and if the relief obtained is otherwise insubstantial or insufficient to make him whole, he requests that this court award equitably relief in the form of front pay for an appropriate period of time.

### Count III (Retaliatory Discharge Under § 448.102)

40. Plaintiff readopts all factual allegations stated above. This is a state law retaliatory discharge claim.

41. Florida Statute § 448.102 (2000) provides as follows:

> An employer may not take any retaliatory personnel action against an employee because the employee has:
>
> (1) Disclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation. However, this subsection does not apply unless the employee has, in writing, brought the activity, policy, or practice to the attention of a supervisor or the employer and has afforded the employer a reasonable opportunity to correct the activity, policy, or practice.
>
> (2) Provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer.

(3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.

42. Plaintiff engaged in protected activity that is otherwise known as whistle-blowing in that he informed his superiors of unlawful or improper conduct being systematically committed by the Defendants in furtherance of enhancing profits, and that he was terminated for that reason and no other. The professed elimination of his position is a ruse and a pretext. He was terminated because he became a threat to the profitability of the company, which profits were the result of knowingly illegal and fraudulent operations.

43. Plaintiff's actions fall squarely within the holding of *Golf Channel v. Jenkins*, 752 So.2d 561 (Fla.2000), and he is fully entitled to his lost wages, attorney's fees, costs, and such other equitable relief as the court may award.

Wherefore, the Plaintiff prays that this Court will take jurisdiction of this claim and conduct such further actions as are required or contemplated by the False Claims Act and the pendent state claim, and award such relief, damages and moiety as the law allows or requires, including attorney's fees and costs.

Dated this 23rd Day of September, 2002.

Robert G. Walker, P.A.

Robert G. Walker, Jr., Esq.
Attorney for Plaintiff/Relator Terry Dixon
1421 Court Street, Suite F
Clearwater, Florida 33756
Phone: (727) 442-8683
Fax: (727) 441-1895
Fla. Bar No. 329428

cc:    U.S. Attorney, Middle District of Florida
       Attorney General, Washington, D.C.