UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

The United States of America,
ex rel. Terry Dixon

    Plaintiffs,

vs.                                  CASE NO. 8:02-CV-1737-T-27-TGW

Lincare Corp., and
Med4Home, Inc.,

    Defendants.
_____/

## FIRST AMENDED CONFIDENTIAL QUI TAM COMPLAINT

Plaintiff Terry Dixon, by and through his undersigned counsel, does bring this civil action against the Defendants, pursuant to the Federal False Claims Act (FCA), 31 U.S.C. § 3730 (1999), on behalf of himself and the United States, and he further includes a concurrent, pendent claim under Florida's Whistleblower Statute (private sector version) and does say:

### I. JURISDICTION & VENUE

1.    Terry Dixon (Dixon) is a U.S. citizen and resident of the Middle District of Florida, who has previously filed an initial Complaint in this matter, and to date that Complaint has not been answered or otherwise responded to. In fact, it remains confidential as required by the FCA as it remains within the initial 60-day confidentiality window available to the Government to consider intervention. He is referred to herein as the Plaintiff in his capacity as a Relator who has initiated this lawsuit.

2.    Lincare Corp. (Lincare) is believed to be a Florida corporation with its principal place of business located in Clearwater, Florida.

3.    Med4Home, Inc. (Med4Home), is a corporation which was purchased by Lincare

-1-

Corp. within the past year. Med4Home's principal place of business is located in Kansas City, Missouri. It is a Delaware corporation which is registered in Missouri as an out-of-state corporation authorized to do business in Missouri. Prior to the acquisition of Med4Home by Lincare, these two corporations were in competition.

4. Both Lincare and Med4Home are involved in the business of supplying medical prescriptions by mail order throughout the United States to patients, and the companies are compensated or reimbursed in whole or part by Medicare. Income to the Defendants is derived from both the supplying and the mailing of the prescription medication.

5. Both Lincare and Med4Home operate, substantial business or are located in the Middle District of Florida. Med4Home is now a subsidiary of Lincare Corp. and Plaintiff refers to them, their employees, contractors, officers and agents collectively as the Defendants.

6. Plaintiff Dixon has come by his personal knowledge of fraud perpetrated by both Lincare and Med4Home as an computer programmer analyst who was hired by Lincare to upgrade certain of the software used to process the prescription orders. During his employment he became aware of practices, policies and activities which he believed to be fraudulent and illegal, and upon informing his immediate superior at Lincare, Brad Harms, he was told to ignore the fraud and cease any efforts to disclose or rectify it. He was threatened with discharge if he did not accede to the improper practices. Dixon refused and was informed by Brad Harms that the necessary position for which he had so recently been hired was being eliminated–even though there was a need for the position, the work he was hired to do was still underway, and an outside independent contractor with less experience, skill and knowledge was retained at a higher hourly rate to do the work.

7. Congress enacted the FCA at the behest of President Abraham Lincoln during the

Civil War in 1863 with the primary purpose of being the government's litigation tool for combating fraud against the federal government, with particular regard to profiteering by suppliers of wartime goods to the Union. (See Senate Judiciary Committee, *False Claims Amendments Act of 1986*, S.Rep. No. 345, 99th Cong., 2d Sess. 2 (1986), reprinted in 1986 U.S.C.C.A.N. 5266)

8. The FCA authorizes private individuals, in addition to the Attorney General, to file civil actions for enforcement. (31 U.S.C.S. § 3730(b) (Supp.1994))

9. Suits by private individuals, or qui tam suits, may be brought for any substantive violation of the Act. ( Id. at § 3730(b)(1))

10. However, the suit is brought in the name of the Government which has the option of intervening and proceeding with the action. (Id. at § 3730(b)(1) & (4)) The statute provides that the Complaint is confidential for at least sixty days and to be served only on the appropriate U.S. Attorney and the Attorney General. This claim was originally served on the U.S. Attorney for the Middle District of the state of Florida on September 23, 2002. This amendment is primarily grammatical and to clarify and more specifically detail the elements of fraud in accordance with Fed.R.Civ.P. 9(b), as required by *U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301 (11th Cir. 2002), as well as to specify an additional, separate fraudulent activity of Lincare that was omitted from the original complaint.

11. If the Government declines to intervene in the qui tam action, the private individual or relator possesses the right to conduct the action. (Id. § 3730(b)(4)) The Government may extend the sixty-day period to intervene.

12. The relator on behalf of the Government in this qui tam and retaliatory discharge case is Terry Dixon. His information is derived of firsthand knowledge as well as direct

evidence in the form of admissions against interest and other inculpatory comments and statements made to him by employees of both Defendants, as well as his observations of the actions of those whose actions were required for the fraud to be successful. As a computer analyst, he was able to "eavesdrop" on various computer operations as they were occurring, as well as examine the computerized histories and data of various transactions to reveal the existence, scope, nature and extent of the fraud–as well as identify at least some of those key individuals directly involved in committing and concealing the wrongful acts.

13. If the Government chooses to intervene, it has the primary responsibility for prosecution and may settle or dismiss the action. (Id. § 3730(c)(2)) The individual Plaintiff has no right to pursue an independent claim until the U.S. Attorney fails or declines to intervene. Plaintiff's evidence is so compelling and the potential for recovery of a substantial sum of money against one or both Defendants, as well as those employees of both who are involved, who may have also committed criminal acts against the United States.

14. The Relator may continue as a party to the qui tam action and may object to its settlement or dismissal. Id. § 3730(c). However, the action may be settled or dismissed notwithstanding objection provided the relator has been notified of the proposed action and an opportunity for a hearing on the motion.

15. It is Plaintiff/Relator Terry Dixon's preference to assist, advise and give such testimony and information as is necessary to persuade the Government to intervene and actively and aggressively prosecute this case. Plaintiff Dixon's cooperation and assistance as the originator of the whistleblower complaint is founded both upon the federal False Claims Act as well as the Florida Whistleblower Statute, §§ 448.101, et. seq., Florida Statutes (2000). He has pursuant to his obligations under the FCA provided a witness list and a summary of the potential

testimony of the principle witnesses in the instant fraud, as well as their actions with regard to the commission of or acquiescence to the fraud, to the United States Attorney for the Middle District of Florida in Tampa, as well as to the Attorney General.

16. The FCA also provides for the award of a percentage of any settlement proceeds as well as reasonable attorney's fees and costs. (Id. § 3730(d)(1)) The FCA specifically provides that in an action where the government proceeds with a case brought by a private individual, the relator "shall ... receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." (Id.) Further, a relator "shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant." (Id.) Plaintiff Dixon desires to avail himself of this remedy and reward now that its existence has been brought to his attention.

17. In addition to the substantive FCA claim, Plaintiff Dixon also has a claim of retaliatory discharge and a violation of U.S.C. § 3730(h), in that he (1) engaged in conduct protected under the False Claims Act; (2) Defendant was aware of the plaintiff's actions; and (3) Plaintiff was terminated in retaliation for his conduct, particularly his objection to the unlawful conduct after detecting it and refusing to participate in it. There are remedial provisions of that statute, however (such as reinstatement) that may not be in the Plaintiff's best interest. The other remedies remain unaffected, however, and the court has the power to effect an equitable front pay remedy if the circumstances permit or require.

18. Florida's private sector Whistleblower Statute also contains a fee-shifting provision and exists to provide the same salutary purpose, but without the proportionate sharing

of the recovery of moneys by the Government, but it too prohibits retaliatory discharge and follows the same legal analysis as its federal counterpart.

19. In this action, Plaintiff has actually filed a qui tam lawsuit, and thereby initiated an investigation by the Government into the allegedly fraudulent acts, and also reported the discovered conduct to his or her employer, for which he was warned, threatened and ultimately discharged.

## II. OPERATIVE FACTS

20. Plaintiff Dixon was hired by Lincare in April 2002 based in large measure upon his 21 years of experience in the information technology industry of which the most recent 7 years he had spent performing computer operations with PowerBuilder application development projects as a PowerBuilder Consultant. That particular software application was precisely what was needed, as well as an examination and reworking of the software being utilized at Med4Home.

21. Plaintiff was hired by Lincare PC Product Manager Brad Harms in a "permanent" position to replace more expensive and less qualified independent contractors who had been working on the company's software and he had successfully completed his 90-day probation period.

22. Dixon was hired to patch up software design problems that had resulted in a backlog of computer design enhancement needs, as well as to ultimately rewrite and update some of these software applications. This backlog specifically had to do with the "Pharmware" software recently acquired by Lincare as part of its acquisition of Med4Home, Inc. Prior to Plaintiff's being hired, Lincare was relying upon temporary outside contract programmers to resolve the technical problems, but the job wasn't being completed timely, efficiently or

economically. Plaintiff Dixon was hired to clean up the problems and then turn his efforts to rewriting and enhancing the software.

23. Mr. Dixon performed as expected or exceeded expectations, and his efforts were acknowledged favorably and openly complimented within the company-at least until he uncovered and began to comment upon the fraudulent practices described elsewhere herein. However, in the process of examining the various computer operations and programs, he became aware of some irregularities in the Pharmware reporting system and production database which he brought to the attention of his supervisor, Brad Harms. Some of these included software security omissions that should have been part of the system to prevent unauthorized access or the manipulation of data. The lack of database security was itself a major protocol failure. Also, while going over the system usage and operations, he discovered (1) that some users had in fact fraudulently manipulated data to reflect that physician approvals of mailing medications were falsified (and that as much as 50% of the medications being shipped were shipped in spire of express physician disapproval); (2) that the number of authorized refills had been "adjusted" upward by certain employees of the Defendants with direct access to the database, so that the medications could continue to be shipped without the physicians consent or knowledge; and (3) that patients with multiple prescriptions were having their medications shipped individually rather than collectively, in order to generate a higher return to the company for shipping costs. As he made inquiry in each of these areas, Plaintiff learned that each strategy was calculated and designed to increase profits to the Defendants at a higher concomitant cost to the Government, and in breach of a number of criminal codes, medical protocols, and Medicare regulations.

24. Mr. Harms appeared none too interested in Mr. Dixon's discovery, and in fact grew openly hostile and angry when Plaintiff would offer suggestions to remedy what he thought

at the time were inadvertent software misapplications and errors. The more Plaintiff learned about how these "errors" factored into increased company profits, the more he was able to see how they all fit together in a common plan to deceive the Government, violate the directions of the patients' physicians, and falsely fabricate orders for which there was no actual approval, as well as to compound the wrong by boosting the number of permissible refills by mail that were authorized. The comments that he not implement corrective procedures which were readily achievable and the directive to cease and desist were the final evidence that the company was on a path of willful and intentional fraud and deception.

25. Within little more than a week after a final objection to the ongoing fraudulent activity, Mr. Dixon was summarily let go by Brad Harms, the very manager who originally hired him, because of a purported reorganization and position elimination. Mr. Dixon thought that most anomalous since the need for his services was still there, Lincare's business was growing, the software still needed to be corrected, updated and redone, and the temporary contractor who was on site and not getting the job done when Mr. Dixon was hired was retained, and even had his contract extended. In fact, the threats and warnings that preceded his discharge left him with not doubt whatsoever that the discharge was because he knew too much about the Defendants' fraudulent activity.

26. Prior to his discharge Plaintiff Dixon plainly and clearly communicated to Brad Harms that there were serious irregularities and improprieties in the way prescription orders were being recorded, sold and shipped, and Plaintiff proposed specific, reasonably simple remedies which Plaintiff had the skill to immediately implement. One of his first suggestions was to implement a software change, including a security system, which would prevent certain employees from changing the physician disapprovals to physician approvals to ship by mail even

with no faxed prescription on file. He also proposed a software fix that would cause all the prescriptions shipped to a single patient to be consolidated and the number of individual shipments reduced. Brad Harms, however, instructed Plaintiff to discontinue his efforts at "fixing" the problems, and ordered him to ignore the irregularities and improprieties, and when Plaintiff refused he was terminated on or about August 30, 2002. The reason given was a pretext.

27. Plaintiff was sent to the business office of Med4Home shortly after being hired by Lincare for several days to address computer software problems there with their "Pharmware" computer program that is used for processing prescription transactions. During his software review and examination of these programs he learned that Med4Home ships prescription medications by United Parcel Service (UPS) as follows:

    a. The customer sees an advertisement by Med4Home (e.g., TV ads, brochure, mailers, etc.).

    b. The customer calls the Med4Home sales department and inquires about obtaining a prescription through the mail.

    c. The Med4Home sales rep first establishes that the prospective customer is eligible for Medicare coverage, and, if so, the sales rep collects customer information, including the name of the customer's Physician.

    d. The sales rep enters the prospective customer's information into the Pharmware production database.

    e. The sales rep calls the prospective customer's Physician by telephone, and the Physician says either "Yes" or "No" to the mail order prescription.

    f. When the Physician says "Yes" the sales rep checks the "Physician Said

Yes" box, and **the Physician's Rx will be sent via fax hard copy within a few days. This is an extremely important part of the documentary evidence because the faxed prescription exists only in approved cases and it contains the number of permissible refills.** This fax will not exist in those cases in which the Physician says no, unless it has been forged, in which case it will not have a comparable record in the issuing physician's records for the patient involved.

g. Approximately 50% of the time, Plaintiff learned, the Physician says "No" and the sales rep checks the "No" box accordingly.

h. The Pharmware application's design will not allow any medications to be shipped to prospective customers whose physician said "No" (an error message will display on the computer screen if this is attempted), and up to this point in the prescription processing everything appears to be legitimate.

i. Where things turn illegitimate is that at random intervals throughout each month the contract programmer(s) would perform a Structured Query Language (SQL) update to the Pharmware production database changing the "Physician Said No" to "Physician Said Yes." This is possible because there is no security system which prohibits such a change. Once this fraudulent "SQL Update" was performed the Pharmware application would then allow the medications to be shipped, but there are no faxed Rx hard copies for these medications, since the Physician refused to approve the Rx and such copies do not exist. The Defendants fake the approval

        where none has been authorized by changing information in the computer. **Plaintiff had access to the workplace, the computers and the personnel who could make these fraudulent changes and was able to verify that certain employees with access to the computer by a simple dial-up from home were in fact doing so. They were Med4Home employees/contract programmers Greg Keesey and Manoj Vijayan, with the knowledge and approval of Med4Home Sales Manger Brent Eberts and Med4Home Programmer Analyst Kurt Morrison**, There were others at Med4Home with access to and knowledge of these software programs, sudden and dramatic increases in sales, the lack of security on access, and other facts and circumstances that would indicate deliberate indifference, conscious and willful ignorance, and other acts that could only suggest an intentional, deliberate, willful, knowing practice and procedure of committing fraud.

j.     Thus, at some level above the sales reps, officials of Med4Home contravened the instructions of a customer's physician without the knowledge of the physician or the patient, and fraudulently effected a sale that was illegal and without authority. They falsely enhanced the number of permissible refills. And they deliberately shipped multiple mailings rather than consolidate and reduce the number of shipments. This is what Plaintiff learned and communicated to Brad Harm, but that was not the full extent of the impropriety that Plaintiff discovered.

28.    Employees at one or the other of the Defendant companies with full knowledge of

these practices, based upon discussions between them and Dixon or necessarily involved in the process, include:

> **Brad Harms**, PC Systems Manager (Lincare)
> **Greg Keesey**, Contract Programmer
> **Manoj Vijayan**, Contract Programmer
> **Kurt Morrison**, Programmer Analyst (Med4Home)
> **Brent Eberts**, Sells Manager (Med4Home)

29. Plaintiff's discovery was based mainly on the medication sales activity for the month of July 2002, but he had access to other data and cumulative information that showed that that period was typical, that the fraud was an ongoing matter, and that it was not an anomaly, isolated event, or inadvertent mistake or result. He believes that a direct and simple reconciliation of the Medicare medication billings against the legitimate prescriptions that Med4Home can produce for a given period of time will confirm the fraud. He has already brought the questionable sales activity for the month of July 2002 to the attention of both Brad Harms, and Greg Keesey (contract programmer), and believes that the July sales activity may have been further manipulated in order to conceal the fraud. Still, he believes that a check of even a sample of the filled orders against the confirmed physician approvals will reveal the fraud because he was told that some 50% of the prescriptions which were shipped were without physician authorization, and that it would be virtually impossible to fraudulently create or forge such prescriptions after the fact (though it might be an interesting exercise to see if that has happened in light of Plaintiff's disclosures prior to his dismissal). In any event, for the physician disapprovals there would be no legitimate fax in the physician's patient chart, nor would the refill information match that in the Defendants' database.

30. The majority of the fraud described above took place prior to the time that Lincare purchased Med4Home. Plaintiff learned that Med4Home caught the attention of Lincare by

showing continued increases in sales figures, to the point that Lincare saw them as such a threat that buying them out became necessary, or Lincare desired to acquire a profitable company and expand its own client base and mail order business. Plaintiff's understanding is that Lincare purchased Med4Home during the past year. But after Med4Home became a subsidiary of Lincare, the illegal practices were still going on and when Plaintiff made it known to his superiors at Lincare he was fired. Lincare was on both constructive and actual notice of the illegal activity of Med4Home at that time and the practices were not only continuing but being continued knowingly by Lincare managers. In fact, Brad Harms and others made comments and asides that indicated they knew that the practices were fraudulent.

31. Plaintiff has engaged the services of the undersigned attorney, an active member in good standing of both the Florida Bar and the federal bar of the Middle District and the Eleventh Circuit. Plaintiff and the undersigned have entered into a fee agreement whereby counsel will, if Plaintiff prevails, be entitled to a reasonable fee.

32. Plaintiff has lost wages, benefits and other valuable property as a result of his discharge from Lincare in retaliation for having engaged in lawfully protected conduct protesting fraud of his employer.

### Count I (Qui Tam Action)

33. Plaintiff adopts the factual allegations stated above. This is a qui tam action on behalf of the United States, alleging that both Defendants Lincare Corp. and Med4Home, Inc. have engaged in an ongoing pattern of criminal conduct, fraud, misrepresentation and other improper conduct contrary to the laws of the United States, the state of Florida, and various other codes, rules and regulations regulating the furnishing of medications for profit.

34. Plaintiff is an originator and Relator of this complaint and to his knowledge he is

the first person to bring such information to the attention of the Government. He did not learn of this information through any source other than his own experience and knowledge as an employee of Lincare.

35. Plaintiff requests intervention by the United States, and understands that this Complaint will be secret and confidential until such time as the Government has an opportunity to explore Plaintiff's allegations and determine if a fraud is being perpetrated against the United States or its citizens. Plaintiff is no longer an insider, but he has information of significant importance as to where government investigators can search to obtain proof of the fraud.

36. Plaintiff has been terminated for objecting to the unlawful ongoing conduct and he has lost income, opportunities, and benefits, in addition to having engaged the services of legal counsel and incurring costs and fees in that regard. He has also spent significant time and effort consulting with his attorney, sharing information, and attempting to locate other proof of his claim in order to assist the Government in making a meaningful inquiry of the Defendants' actions. Plaintiff believes, based upon the sales figures and the numbers that he accessed during his limited software review, that this claim is worth millions of dollars, if not tens of millions, because of the sheer volume and number of unapproved and inflated transactions and shipping procedures, a substantial portion of which has been paid or reimbursed by Medicare. The Defendants' advertising was aimed at Medicare recipients and they comprise the bulk of the Defendants' mail order customers.

37. Plaintiff requests those remedies under the FCA to which he is entitled, to include a percentage of the recovery or settlement made by or with the Defendants, as well as reimbursement of his attorney's fees and costs, and a reasonable attorney's fee for his attorney.

**Count II (Retaliatory Discharge Under § 3730(h))**

38. Plaintiff readopts the factual allegations above and asserts that these allegations constitute the separate violation of the FCA known as retaliatory discharge, in violation of 31 U.S.C. § 3730(h), which states that

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

39. Plaintiff applies for and requests all relief to which he is entitled by this subsection of the FCA, though he frankly thinks that reinstatement might not be a healthy proposal, and if the relief obtained is otherwise insubstantial or insufficient to make him whole, he requests that this court award equitably relief in the form of front pay for an appropriate period of time.

### Count III (Retaliatory Discharge Under § 448.102, Florida Law)

40. Plaintiff readopts all factual allegations stated above. This is a state law retaliatory discharge claim.

41. Florida Statute § 448.102 (2000) provides as follows:

> An employer may not take any retaliatory personnel action against an employee because the employee has:
>
> (1) Disclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation. However, this subsection does not apply unless the employee has, in writing, brought the activity, policy, or practice to the attention of a supervisor or the employer and has afforded the employer a reasonable opportunity to correct the activity, policy, or practice.

(2) Provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer.

(3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.

42. Plaintiff engaged in protected activity that is otherwise known as whistle-blowing in that he informed his superiors of unlawful or improper conduct being systematically committed by the Defendants in furtherance of enhancing profits, and that he was terminated for that reason and no other. The professed elimination of his position is a ruse and a pretext. He was terminated because he became a threat to the profitability of the company, which profits were the result of knowingly illegal and fraudulent operations.

43. Plaintiff's actions fall squarely within the holding of *Golf Channel v. Jenkins*, 752 So.2d 561 (Fla.2000), and he is fully entitled to his lost wages, attorney's fees, costs, and such other equitable relief as the court may award.

Wherefore, the Plaintiff prays that this Court will take jurisdiction of this claim and conduct such further actions as are required or contemplated by the False Claims Act and the pendent state claim, and award such relief, damages and moiety as the law allows or requires, including attorney's fees and costs.

Dated this 18th Day of October, 2002.

Robert G. Walker, Jr., Esq.
Attorney for Plaintiff/Relator Terry Dixon
1421 Court Street, Suite F
Clearwater, Florida 33756
Phone: (727) 442-8683
Fax: (727) 441-1895
Fla. Bar No. 329428

cc: U.S. Attorney, Middle District of Florida
Attorney General, Washington, D.C.